IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GEORGE STRAHAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.  4:13 CV 448 SNLJ |
| | ) |
| DR. FRED ROTTNEK, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff George Strahan ("Strahan") respectfully submits his Memorandum in Opposition to Defendant Fred Rottnek's ("Defendant" or "Rottnek") Motion for Summary Judgment ("Motion"), as follows:

**INTRODUCTION**

In this case, Strahan seeks redress for the constitutional injuries inflicted upon him by the Defendant.  The Defendant's policy is to treat virtually all inmates with pre-existing prescriptions for narcotics to treat severe, chronic pain by intentionally and abruptly withdrawing them from their narcotic treatment regime and replacing it with over-the-counter Tylenol pills. In other words, inmates such as Strahan who enter Defendant's care with prescribed narcotic pain-killers are immediately dropped to mere Tylenol, without any individualized examination. That such a practice is formalized in a stated policy evidences a deliberate and intentional indifference to the pain, suffering, and risk of severe withdrawal symptoms experienced by those inmates.  Strahan therefore requests that this Court join other courts nationwide who have denied summary judgment to jailhouse medical providers who have enacted similar policies, and allow Strahan to seek recovery for his injuries at trial.

# **FACTUAL BACKGROUND**[1]

Strahan originally injured his back in a fall he sustained while working as a tree trimmer in 1990. Plaintiff's Response to Defendant's Statement of Uncontroverted Material Facts and Statement of Additional Uncontroverted Facts ("Pl. SOUF"), ¶ 93. Since then, Strahan's back injuries have been aggravated by multiple motor vehicle collisions and other accidents. *Id.* ¶ 94. MRIs of his lumbar and cervical spine show multiple abnormalities throughout his spine, including Schmorl's node, disc desiccation, annular tears, disc bulges, bilateral facet arthropathies, lesions, synovial cysts, bilateral neural foraminal narrowing, and foraminal stenosis. *Id.* ¶ 95.

As a result of these injuries, Strahan suffers severe and chronic pain, which he likens to the pain of experiencing fire in his back. *Id.* ¶ 93. To treat his pain, Strahan has from time to time been under the car of pain specialists, but his itinerant living conditions, including multiple incarcerations in Missouri jails and prisons, have made stable care difficult. *Id.* ¶ 96.

Multiple medical providers have treated Strahan's pain on the condition that he provide regular urine samples to ensure his narcotic intake matches the prescribed doses. *Id.* ¶ 97. Only once has a doctor discharged Strahan from his care for a failed urinalysis screen, which occurred after Strahan was temporarily in jail and denied access to his prescription medicine. *Id.* ¶ 98.

Another lapse in stable care occurred in the late spring and summer of 2011, when Strahan was displaced from his home in Poplar Bluff as a result of the severe flooding. *Id.* ¶ 99. As a result of lost access to his prescribed medication, Strahan sought treatment for his severe, chronic pain at hospital emergency rooms. Strahan's search for a stable pain treatment specialist

---

[1] The facts of this case are set forth in greater detail in Stahan's Response to Rottnek's Statement of Uncontroverted Material Facts, and are herein incorporated by reference. Relevant facts are summarized briefly here.

has been hampered at times by his Medicaid coverage, which Dr. Sturm confirmed is a barrier to treatment at many pain specialists' offices. *Id.* ¶ 100.

Strahan was, until his recent transfer to the Department of Corrections, in pre-trial confinement at the Buzz Westfall Detention Center in St. Louis County, Missouri (the "Jail"). Since August 2012 until the time that Strahan entered the Jail, he was under the care of Dr. Beyzer, who wrote a Vicodin prescription for one to two 10mg hydrocodone/325mg acetaminophen pills every six to eight hours, a prescription allowing Strahan to take up to 80 mg hydrocodone each day.[2] *Id.* ¶ 101.

Upon entering the Jail, Strahan came under the medical care of Rottnek, who is both the Medical Director and Lead Physician of the Jail. *Id.* ¶ 102. Once at the Jail, Strahan became subject to Rottnek's policy that restricted the use of narcotic pain killers to those inmates who were either battling cancer or had amputated limbs. *Id.* ¶ 103. Strahan fell under neither category, and so pursuant to Rottnek's policy, Rottnek's staff abruptly transitioned Strahan off of his narcotic pain medication to a treatment regime consisting solely of over-the-counter strength Tylenol. *Id.* ¶ 108.

At the Jail, an intake nurse conducted an intake assessment of Strahan. *Id.* ¶ 109. During that assessment, Strahan reported he took Vicodin medication every four hours. *Id.* The next day, Strahan was prescribed a five day prescription for one Vicodin pill twice daily containing 5mg hydrocodone/500mg acetaminophen to cope with acute pain to his wrist. *Id.* ¶ 111. Strahan therefore was allowed 10 mg hydrocodone per day for only five days upon entering the Jail, a decrease in his Vicodin intake to between one eighth of his previous medication. *Id.* After

---

[2] Defendant makes an issue of the fact that Strahan took both oxycodone and hydrocodone contemporaneously prior to his incarceration. Strahan's pharmaceutical records show, however, that in the three months leading up to his incarceration, Strahan received one three-day prescription for oxycodone from a Dr. Sanford Sineff. Otherwise during that period, he received 20-day and 30-day prescriptions of hydrocodone from Dr. Beyzer. *Ex. 3*; *Ex. 4*; *Ex. 5*.

Strahan's Vicodin prescription was terminated on December 3, 2012, the Jail medical records show the only medication offered to Strahan was Prilosec (for excessive stomach acid), Norvasc (a blood pressure medicine), and Tylenol.  *Id.* ¶ 112.  Neither Rottnek nor anyone on his staff prescribed any other analgesic until January 18, 2013, six and one half weeks after Strahan was incarcerated.  *Id.* ¶ 113.  The only drug related to his pain prescribed to Strahan was the muscle relaxant Flexeril (cyclobenzaprine) three and one half weeks after incarceration, on December 28, 2012.  *Id.* ¶ 114.  It was not until April 25, 2013, nearly five months to the day since Strahan was incarcerated, and only after Strahan refused other pain medication causing him seizures and informed Dr. Rottnek of the pending lawsuit, that Dr. Rottnek prescribed Vicodin for Strahan.  *Id.* ¶ 115.  At this point, Rottnek prescribed two pills three times a day, for a total of 30mg of hydrocodone, approximately 37 percent of the level Strahan received from Dr. Beyzer prior to his incarceration.  *Id.* ¶ 116.

Rottnek's policy of cutting off all narcotic pain medication to inmates who enter the Jail with prior prescriptions for narcotic pain-killers, as applied to Strahan and other inmates, inflicts severe pain and suffering on the patients and carries with it grave risks of severe withdrawal symptoms.  Rottnek's policy is equivalent to shutting off pain management completely by "go[ing] from high potency medication to Tylenol."  *Id.* ¶ 106.  This policy is "a formula to throw [patients] into withdrawal."  *Id.* ¶ 107.  It carries with it the risk of severe side effects, including seizures, hypertension, vomiting, tearing of the esophagus, tachycardia, diarrhea, pain and suffering, and in severe cases, death.  *Id.*

## ARGUMENT

**I.    Summary Judgment Is Not Appropriate on Strahan's § 1983 Claim.**

The evidence demonstrates that Rottnek was deliberately indifferent to Strahan's Eighth and Fourteenth Amendment rights when Rottnek instituted a no-narcotics policy under which

Strahan was denied access to adequate pain control for a period of nearly five months. Subjecting Strahan to such a policy was an abdication of the exercise of medical judgment. This is not a case of disagreement of medical judgment; this is a case where the institutionalized policy crafted by Rottnek created a situation in which no medical judgment was exercised with respect to Strahan's pain, resulting in a complete denial of care. This triggered a five-month long ordeal for Strahan.

"An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "[D]enial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* "The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency…." *Id.* "We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104 (internal citations omitted). A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chess v. Dovey*, No. CIV S-07-1767, 2011 U.S. Dist. LEXIS 15835, *14 (E.D. Cal. 2011) (findings and recommendations of magistrate judge adopted in full by 2011 U.S. Dist. LEXIS 33750 (E.D. Cal. Mar 29, 2011)). "Indications of a serious medical need include the presence of a medical condition that significantly affects an individual's daily activities." *Id.* at *14-15.

    A.    **Rottnek's No-Narcotics Policy Constituted a Failure to Treat Strahan.**

In multiple cases around the country, district courts have denied summary judgment motions by jail or prison medical providers when pain medication is withheld from a patient due to a treatment policy. In *Chess v. Dovey*, for example, the inmate had been treated at one facility where it was determined that his pain required treatment with the narcotic methadone. *Id.* at *4.

He was later transferred to High Desert State Prison, a facility that had a policy prohibiting methadone for patients in general population. *Id.* at *19-20. The inmate was tapered off methadone and treated at various times with Tylenol, ibuprofen, and naproxen. *Id.* at 5. In *Chess*, the defendant medical providers relied on the prescription of these other medications to argue that they "did attempt to treat plaintiff's pain," and that the plaintiff was merely claiming a preference for "methadone over aspirin and naproxen to treat his chronic pain...." *Id.* The court disagreed. In denying summary judgment, it said:

> A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Moreover, while the court agrees that plaintiff does not have a constitutional right to choose his own medication, the Eighth Amendment does protect plaintiff from the "unnecessary and wanton infliction of pain."
>
> Here, it is undisputed that plaintiff had serious medical needs and that a prior treating physician of his prescribed methadone to treat plaintiff's pain. It is also undisputed that upon plaintiff's transfer to HDSP defendants refused to continue plaintiff on methadone, ***not because any one of them determined it was medically unnecessary, but solely because HDSP policy prohibits general population inmates from receiving methadone.***

*Id.* at *58-59 (internal citations omitted) (emphasis added). "[A] reasonable jury could find the defendants were deliberately indifferent to plaintiff's serious medical need. Specifically, given this evidence a rationale jury could find that the defendants failed to provide adequate medical care in treating his pain." *Id.* at *63-64. This case bears close resemblance to *Chess v. Dovey*. As in *Chess*, Strahan was prescribed a narcotic pain-killer, Vicodin, prior to his incarceration at the Jail. As in *Chess*, upon his incarceration, Strahan was denied any access to Vicodin pursuant to Defendant's no-narcotics policy. As in *Chess*, Strahan makes a strong showing of deliberate indifference to his severe and chronic pain.

Likewise, in *Clutters v. Sexton*, narcotic pain medication was withheld from an inmate, causing him to act aggressively and erratically. *Clutters v. Sexton*, No. 1:05cv223, 2007 U.S. Dist. LEXIS 84025, *7-14 (S.D. Ohio 2007). During a struggle with guards, Clutters struck his

head and died a short time later from the impact to his head.  In *Clutters*, the court recognized that even though the inmate's death was caused by the head trauma, the defendants subjected him to needless suffering by withdrawing his pain medication, and exposed him to risk of "serious medical consequences to the patient's health." *Id.* at *27-28.  Specifically, "the Court finds that the County's policy prohibiting all narcotics results in a complete denial of medical care.  Because the County's policy does not permit any determination regarding an individual prisoner's medical need for a narcotic prescription, the policy has the effect of denying the prisoner medical treatment." *Id.* at *33-34.  Again, this case is closely analogous to *Clutters*.  Defendant's "policy of prohibiting all narcotics" resulted in "a complete denial of medical care" to Strahan.  *Id.*

Similarly, in *Anderson v. Tate*, defendants transitioned the incarcerated plaintiff from morphine to Tramadol, which was itself later discontinued.  *Anderson v. Tate*, No. 2:12-cv-0261, 2014 U.S. Dist. LEXIS 65238, *12 (E.D. Cal May 12, 2014) (findings and recommendation by magistrate judge, adopted in full at 2014 U.S. Dist. LEXIS 87254 (E.D. Cal. June 25, 2014)).  The court concluded:  "[A] reasonable prison official would have known that discontinuing all narcotics, and thereby causing plaintiff pain, violated the Eighth Amendment." *Id.* at *22.

Like each of the above jails and prisons, the Jail at which Strahan was incarcerated had a no-narcotic policy.  Rottnek himself described the policy by which "the vast majority" of inmates who arrived at the Jail with a pre-existing narcotic prescription were denied that medication and put onto non-narcotic treatments:

> [T]he vast majority of the people at the jail we will put back on a stepwise approach.  Occasionally someone will come in with an active cancer diagnosis and amputation, coming out of the hospital ICU, or other issues where we'll continue them on controlled substances.  But the vast majority of patients that we have at the jail – and Mr. Strahan is very similar to many, many patients we have at the jail – we take a stepwise approach to analgesics.

1097-001/86628                                              7

*Ex. C*, 180:18-181:2.  Under Defendant's "stepwise approach," the patient is reduced to an analgesic such as Naproxen or, in Strahan's case, Tylenol. *Ex. C*, 181:19-182:9.  When the patient is unable to control pain with the new analgesic medication, the patient is slowly stepped up to stronger doses or stronger medication.  Strahan was first treated with Tylenol, followed by a combination of Tylenol and Flexeril (cyclobenzaprine). *Ex. 1*, at 21.[3]  After that, Rottnek prescribed Tramadol. *Ex. 1*, at 26.  After six weeks, Rottnek doubled the Tramadol prescription. *Ex. 1*, at 28.  After almost another eight weeks, and nearly five full months experimenting with inadequate pain control, Rottnek finally prescribed Strahan the Vicodin that his previous caregivers had prescribed—but at a fraction of the prior doses. *Ex. 1*, at 30-31.

Importantly, Rottnek's policy launched Strahan on this long and painful ordeal without effective medication, despite the fact that Rottnek *had not even examined Strahan*.  At the Jail, there are four individuals who can pain prescribe medication to a patient:  Rottnek, Dr. Hastings, Physician's Assistant Todd Parker, and Nurse Practitioner Erica Chris. *Ex. C*, 31:10-16, 32:5-11, 34:10-12, 36:24-37:1, 39:5-8.  Strahan was not seen or examined by any of these four medical personnel capable of exercising medical judgment with respect to prescriptions until December 28, 201—*i.e.*, one month and one day after Strahan entered the Jail, and 25 days after Strahan's last Vicodin dose.  *See Ex. 1*.  Rottnek's policies allowed for the complete withdrawal of effective pain medication without any individualized decision by those medical personnel tasked with prescribing medication.  This went beyond the provision of negligent care; this constituted a complete failure to provide care.  *Clutters v. Sexton*, No. 1:05cv223, 2007 U.S. Dist. LEXIS 84025, *33-34 ("[T]he Court finds that the County's policy prohibiting all narcotics results in a complete denial of medical care.  Because the County's policy does not permit any determination

---

[3] Exhibit 1 to this Memorandum in Opposition to Rottnek's Motion for Summary Judgment is a subset of the medical records from the Jail that were introduced as Exhibit 2 to the deposition of Dr. Rottnek.  In addition, the medical records in this subset have been reordered into chronological order.

regarding an individual prisoner's medical need for a narcotic prescription, the policy has the effect of denying the prisoner medical treatment.").

### B. The No-Narcotics Policy Violates Applicable Medical Standards of Care.

The no-narcotics policy implemented by Rottnek and applied to Strahan violates the guidelines and position statements of the National Commission on Correctional Health Care ("NCCHC") and the Society of Correctional Physicians ("SCP"). According to Defendant's own expert, Dr. Lubelczyk, who is president of the society, the SCP is an international membership organization that puts on educational conferences for correctional physicians and provides an opportunity to discuss medical issues that arise in the correctional environment. *Ex. D*, 100:11-101:7. Similarly, the NCCHC is an organization that "creates standards for correctional health care[,] provide[s] accreditation for facilities that meet those standards… and provide[s] educational conferences" for correctional health care workers. *Ex. D*, 102:13-103:8. The NCCHC publishes both guidelines, a document "directed to helping the practitioner manage a particular medical condition," and position statements, "a philosophical document that… states the opinion of the organization as a whole… comment[ing] on how the care should be provided." *Ex. D*, 105:5-106:4. Where the NCCHC has issued a position statement, the SCP refrains from issuing a position statement on the same issue and instead endorses the NCCHC position statement. *Ex. D*, 102:9-12.

The NCCHC has released both a position statement and a guideline on the treatment of chronic pain. The NCCHC position statement states, "***Policies banning opioids [narcotics] should be eschewed.***" *Ex. 6*, at 3 (emphasis added). Furthermore, it emphasizes that correctional physicians should work to avoid interruption in a patient's pain treatment: "Continuity of care planning is important, including consideration of resources and reentry into the community. ***Care coordination should be ensured to avoid interruption in pain treatment.***"

*Ex. 6*, at 3 (emphasis added). Lubelczyk admitted that the Strahan experienced "an interruption in his pain management." *Ex. D*, 110:24-111:2.

The NCCHC Guideline for Chronic Noncancer Pain Management more specifically addresses new inmates. That guideline states, "In the case of new inmates who have been receiving long-term opioids, ***pain and function should be assessed at baseline prior to tapering the drug*** and tracked over time to assess any change." *Ex. 7*, at 2 (emphasis added). Rottnek's policy violates this guideline in three separate ways. First, no doctor or other medical professional capable of prescribing medication assessed Strahan's pain and function. No such medical professional examined Strahan until more than a month after his incarceration began, when Physician's Assistant Parker did so. Second, Rottnek's policy never maintained Strahan at a baseline level of prescription medication. Immediately prior to entering the jail, Strahan's prescription allowed him to take between 30mg and 80 mg hydrocodone each day. *Ex. 4*, at 2. At the jail, Strahan was deprived of medication for one full day, and then allowed only 10mg of hydrocodone per day for five days thereafter, which was provided to address a recent wrist injury, not Strahan's chronic pain. *Ex.* 1, at 8; *Ex. C*, 99:20-100:4. Rottnek's policy thus created an immediate departure from Strahan's baseline intake of medication. Third, Rottnek's policy did not provide for a *tapering down* of medication from a high dose to a lower dose. Instead, it provided for an immediate termination of medical treatment followed by an extremely slow *stepping up* of medication from Tylenol to increasingly stronger medications. *Ex. C*, 180:18-181:2. Had Strahan not suffered a suspected wrist injury requiring the five day prescription of Vicodin, the transition from Vicodin to Tylenol would have been immediate. *Ex. C*, 101:9-10.

Rottnek's policy contravenes both the NCCHC position statement and the NCCHC guideline. First, it is a policy banning narcotics for a "vast majority of people," *Ex. C*, 180:18-

181:2, which must be "eschewed." Second, it creates intentional interruptions in care. Third, it fails to taper patients from a baseline to a lower dose and instead immediately cuts patients off from their medication without establishing a baseline at all.

      **C.    Uncontroverted Evidence Demonstrates Deliberate Indifference, the Finding of Which is a Conclusion Reserved for the Trier of Fact.**

Rottnek's deliberate indifference is demonstrated by his own admission that he enforced a no-narcotics policy for all inmates, who like Strahan, had not been diagnosed with cancer, suffered an amputation, or otherwise recently left the ICU. *Ex. C*, 180:18-181:2. Creating this policy, and allowing it to remain in place, was a conscious and deliberate decision by Rottnek, the medical director and lead physician of the Jail, that showed an indifference to the pain, suffering, and effects of withdrawal that would be felt by those inmates who were subject to it.

Contrary to Defendant's contentions, Plaintiff's expert Dr. Sturm did not argue that it was deliberately indifferent to desire to reduce inmate reliance on narcotic pain medication. Instead, Rottnek betrayed the deliberate indifference through the method that Rottnek employed to achieve that goal. Rather than monitor Strahan to establish a baseline prior to tapering the narcotic drug, as provided for in the NCCHC guideline, *Ex. 7*, Rottnek's policy suddenly and immediately cut the patient off from all access to narcotic pain relief and substituted over-the-counter pain medication. Sturm testified that he knows of no pain specialist who employs such a method. *Ex. A*, 174:18-21. Sturm testified this is not an accepted practice among practitioners within Rottnek's specialty, *i.e.*, family or general practitioners, *Ex. A*, 176:1-6. Sturm testified that he knows of no literature that employs such practice. *Ex. A*, 175:2-6, 176:7-16. It is clear that the correctional medicine literature recommends exactly the opposite method. *Ex. 6*; *Ex. 7*.

Case law reveals that this no-narcotics policy had been instituted elsewhere: in prison and jail facilities at which other courts have found the policy to reflect a deliberate indifference to

1097-001/86628                              11

inmates' serious medical needs.  *Chess v. Dovey*, 2011 U.S. Dist. LEXIS 15835 at *58-59 (holding that the policy cut off access to medication "not because any one of them determined it was medically unnecessary, but solely because HDSP policy prohibits general population inmates from receiving methadone"); *Clutters v. Sexton*, 2007 U.S. Dist. LEXIS 84025 at *33-34 ("[T]he Court finds that the County's policy prohibiting all narcotics results in a complete denial of medical care.  Because the County's policy does not permit any determination regarding an individual prisoner's medical need for a narcotic prescription, the policy has the effect of denying the prisoner medical treatment."); *Anderson v. Tate*, 2014 U.S. Dist. LEXIS 65238 at *22 ("[A] reasonable prison official would have known that discontinuing all narcotics, and thereby causing plaintiff pain, violated the Eighth Amendment.").  As noted in *Clutters*, this policy constitutes, not merely inadequate care, but a complete denial of medical care.

      Rottnek argues that Dr. Sturm acknowledged Rottnek was not deliberately indifferent.  *See Memorandum in Support*, at 8.  This argument relies on a misinterpretation of Dr. Sturm's testimony, and it is legally irrelevant because an expert witness's opinion regarding the ultimate legal conclusion of deliberate indifference is inadmissible.  First, when asked whether he believed that Dr. Rottnek acted in conscious disregard for Strahan's well-being, Sturm responded that he did not believe it was a conscious decision against Strahan personally, but a policy of indifference that required "weaning everybody off their medication."  *Ex. A*, 161:8-15 ("I don't think it was a conscious disregard against Mr. Strahan.  I don't agree with their policy of weaning everybody off their medications and putting them on Tylenol.")  Sturm testified that he did not think Rottnek singled Strahan out for special indifferent treatment, but rather consciously disregarded the well-being of the entire narcotic-prescribed inmate population.  *Id.*  Sturm further testified that as a result of this policy "basically you've just completely shut the patient's pain

medication off." *Ex. A*, 162:8-12; *Clutters v. Sexton*, 2007 U.S. Dist. LEXIS 84025 at *33-34 ("[P]olicy prohibiting all narcotics results in a complete denial of medical care."). Furthermore, while Rottnek characterizes Sturm's testimony as a declaration that Rottnek was not indifferent, Sturm actually merely refused to commit an answer to a question calling for a legal conclusion. *See* Response to Statement of Uncontroverted Facts, ¶¶ 34-35.

Sturm's refusal to commit to answering the question of Rottnek's ultimate indifference is supported by case law holding that such testimony is inadmissible. *Wilson v. Douglas County*, No. 8:03CV70, 2005 U.S. Dist. LEXIS 28541, *4-5 (D.Neb. 2005) ("[B]y expressing the opinion that the official was deliberately indifferent, the expert gives the false impression that he knows the answer to this inquiry, which depends on the official's mental state.") (quoting *Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997) (brackets omitted)). An opinion of the U.S. District Court for the Eastern District of Missouri has reached the same conclusion. *Tanner v. City of Sullivan*, No. 4:11-CV-1361 NAB, 2013 U.S. Dist. LEXIS 3274, *6-7 (E.D. Mo. 2013) ("The Court finds that Mr. Eiser cannot testify as to the ultimate issue of whether Defendants' actions were deliberately indifferent to Palmer's medical needs."). Neither Sturm nor Lubelczyk may testify whether or not Rottnek was deliberately indifferent.

**II.    Summary Judgment Is Not Appropriate on the State-Law Malpractice Claim.**

The uncontroverted material facts not only demonstrate that summary judgment should not be entered for Rottnek, but they also demonstrate that Rottnek was negligent in his failure to treat Strahan. The only argument Rottnek raises against the medical malpractice claim is a charge that Sturm is not qualified to testify to the standard of care of a correctional physician. This claim does not withstand scrutiny.

As an initial matter, Strahan's medical malpractice claim should survive summary judgment because of all of the foregoing arguments in Part I that apply to Strahan's § 1983

claim. The § 1983 claim requires a showing of deliberately indifferent medical care, whereas the medical malpractice claim requires a showing of negligent medical care. *Sundermeyer v. SSM Regional Health Services*, 271 S.W.3d 552, 554 (Mo. banc 2008). "Deliberate indifference described a state of mind more blameworthy than negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Therefore, by demonstrating that Rottnek treated Strahan with deliberate indifference, Strahan has demonstrated that Rottnek treated Strahan with negligence.

Rottnek focuses on the expertise of Sturm in an attempt to disqualify his testimony on the grounds that Sturm has not served as a physician in a correctional facility. This, however, is the incorrect focus. While Rottnek practices in a correctional institution, his formal training and classification within the medical profession is as a family practitioner. Rottnek completed both a residency and a fellowship in family medicine. *Ex. C*, 10:12-13. Rottnek's training was that formalized for the family medicine residency program. *Ex. C*, 11:18-24. Rottnek's board certification and licensure is in family practice. *Ex. C*, 12:15-23. As of his March 2014 deposition, Rottnek was planning to sit for his recertification for family practice board certification in April 2014. *Ex. C*, 12:25-13:2. As such, Rottnek's practice is subject to the quality indicators and annual education requirements of the American Board of Family Medicine. *Ex. C*, 13:2-5. "Correctional medicine" is not a recognized specialty or subspecialty of the Accreditation Council for Graduate Medical Education, and no board certification is offered in correctional medicine. *Ex. C*, 260, 1-15. Rottnek may practice in correctional institutions, but he is doing so as a family practitioner.

Sturm is qualified to testify as an expert regarding the standard of care for family practitioners because of his experience in working with family practitioners in his pain management practice. Sturm testified that through his practice, he works with and interacts with

family practitioners.  *Ex. A*, 175:7-10.  Sturm testified that he receives referrals for patient care from family practitioners.  *Ex. A*, 175:11-13.  Sturm testified that he coordinates with family practitioners regarding the treatment of patients' pain management care. *Ex. A*, 175:14-17.  Most importantly, Sturm testified that through his work as a specialist in the pain management field, he has become familiar with accepted practices of pain management as carried out by family practitioners.  *Ex. A*, 175:18-23.  Sturm does not need to be a family practitioner in order to testify to the standard of care to which family practitioners are held.  Nowhere in his deposition did Sturm testify that he held Rottnek to a standard of care for someone, who like Sturm, has certified with advanced qualifications in pain management by the American Board of Medical Specialists.  *Ex. A*, 18:15-19:11.

Finally, even if there were a separate standard of care for "correctional medicine," Sturm's testimony demonstrates that he would be qualified to address it.  *See Ex. A*, 112:1-13.  Sturm expressly denied that he was "not familiar with the standard of care for corrections medicine," *Ex. A*, 210:18-21, and he testified instead that "general medical … principles apply here," *Ex. A*, 210:23-25.  In fact, Defendant's repeated insistence that a totally different standard of care applies to the treatment of prisoners cannot be squared with the authoritative guidance of the Supreme Court: "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment should be denied with respect to both Counts I and II.

Dated: October 3, 2014                                    Respectfully Submitted,

                                                          CLARK & SAUER, LLC

                                                By:   */s/ D. John Sauer*
                                                      D. John Sauer, #58721MO
                                                      Jason S. Dunkel
                                                      7733 Forsyth Blvd., Suite 625
                                                      St. Louis, MO  63105
                                                      jsauer@clarksauer.com
                                                      Phone:  314.814.8880
                                                      Fax:  314.332.2973
                                                      *Attorneys for Plaintiff George Strahan*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2014, I caused the foregoing document to be transmitted electronically to the Clerk of the Court using the ECF System for filing.  Based on the electronic records currently on file, the clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

                                        CHRISTINE A. VAPOREAN
                                        BROWN & JAMES P.C.
                                        800 Market Street, Suite 1100
                                        St. Louis, MO  63101
                                        E-mail: cvaporean@bjpc.com
                                        Tel:  314-242-5337
                                        *Attorney for Defendant Fred Rottnek*


                                                */s/ D. John Sauer*